UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| KEVIN CAPALBO, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 2:10-cv-348-JHR |
| | ) | |
| KRIS-WAY TRUCK LEASING, INC., | ) | |
| | ) | |
| Defendant | ) | |

MEMORANDUM DECISION AND ORDER
ON MOTION FOR SUMMARY JUDGMENT[1]

Defendant Kris-Way Truck Leasing, Inc. ("Kris-Way") moves for summary judgment as to all of plaintiff Kevin Capalbo's claims of whistleblower retaliation in violation of the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S.A. §§ 831-40, and the Surface Transportation Assistance Act ("STAA"), 49 U.S.C. § 31105. *See* Defendant's Motion for Summary Judgment ("Motion") (Docket No. 21) at 1-2; Complaint (Docket No. 1). For the reasons that follow, I grant the Motion in part and deny it in part.

**I. Applicable Legal Standards**

**A. Federal Rule of Civil Procedure 56**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have me conduct all proceedings in this case, including trial, and to order the entry of judgment.

is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id*. The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial

or qualification with an appropriate record citation. *See id*. The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id*. The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id*.

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id*.; *see also, e.g., Sánchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209, 213-14 (1ˢᵗ Cir. 2008); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II. Factual Background

As a threshold matter, I note that, in their statements of material facts, the parties dispute certain points of law, including whether, pursuant to applicable United States Department of Transportation ("DOT") regulations, Capalbo was required to maintain daily driver logbooks while employed as a so-called "yard jockey" by Kris-Way. *Compare, e.g.*, Defendant's Statement of Material Facts ("Defendant's SMF") (Docket No. 22) ¶¶ 3, 26 *with* Plaintiff's

Responses to [] Defendant's Statement of Material Facts ("Plaintiff's Opposing SMF") ¶¶ 3, 26; *compare also, e.g.*, Plaintiff's Statement of Facts ("Plaintiff's Additional SMF") (Docket No. 35) ¶¶ 36, 81-82 *with* Defendant's Response to Plaintiff's Statement of Facts ("Defendant's Reply SMF") (Docket No. 39) ¶¶ 36, 81-82.   The parties' conflicting interpretations of DOT regulations or other legal requirements are not "facts."   Hence, I omit them from my factual recitation.   By contrast, the following are "facts": (i) statements concerning what certain individuals understood or believed the DOT to require, and (ii) statements describing the content of Kris-Way's policies, even if those policies are predicated in whole or in part on DOT regulations.   I have included those statements to the extent that they are admitted or supported by the citations given.

With that clarification, the parties' statements of material facts, credited to the extent that they are admissible over any objection and are either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of Capalbo as nonmovant, reveal the following relevant facts.[2]

### A.  Kris-Way's Business

Kris-Way is a Maine-based company providing truck rentals and leasing, dedicated contract carriage, and contract maintenance services.   Defendant's SMF ¶ 1; Affidavit of James Ryan ("Ryan Aff.") (Docket No. 24) ¶ 1.   It has its own trucks and drivers, leases trucks to other companies and individuals, and repairs trucks and trailers.   *Id*.   Its largest facility is in South

---

[2] To the extent that I have incorporated one party's qualification into the statement of the other, I have determined that the qualification is supported by the record citation(s) given.   In addition, to the extent that I have determined that Capalbo denies statements of Kris-Way, I have determined that the denial is supported by the record citation(s) given.

Portland, where it employs approximately 136 drivers, mechanics, and administrative personnel. *Id*. It has a total of 214 employees and has been in business since 1978. *Id*.[3]

### B.  Nature of Capalbo's Job

Capalbo was employed by Kris-Way as a commercial truck driver from July 2006 through August 20, 2008.  Defendant's SMF ¶ 4; Plaintiff's Opposing SMF ¶ 4.  He was hired to do two jobs: yard work and over-the-road work.  Plaintiff's Additional SMF ¶ 3; Defendant's Reply SMF ¶ 3.

During his employment with Kris-Way, Capalbo worked primarily as a "yard jockey" at the Country Kitchen warehouse terminals in Lewiston, Maine.  Defendant's SMF ¶ 24; Plaintiff's Opposing SMF ¶ 24.  Yard work involved moving trailers between and around the bakery yards.  Plaintiff's Additional SMF ¶ 4; Defendant's Reply SMF ¶ 4.  The two yards are about a half mile apart.  *Id*.[4]  A yard jockey spends a portion of his or her work time waiting for instructions from Country Kitchen's shippers, another portion hitching and unhitching trailers and the related lines, and the rest moving and positioning trailers and doing pre- and post-work truck inspections.  Defendant's SMF ¶ 25; Affidavit of Clayton Farrin ("First Farrin Aff.") (Docket No. 23) ¶ 3.[5]

Country Kitchen determines the yard jockey's starting and ending times on any given day.  Defendant's SMF ¶ 27; Plaintiff's Opposing SMF ¶ 27.  When working as a yard jockey, Capalbo was Kris-Way's only employee assigned full time to Country Kitchen's terminals.  Defendant's SMF ¶ 28; First Farrin Aff. ¶ 3.[6]  Capalbo, when working as a yard jockey, was on

---

[3] I omit the final sentence of Defendant's SMF ¶ 1, which Capalbo denies, Plaintiff's Opposing SMF ¶ 1.

[4] My recitation incorporates Kris-Way's qualification.

[5] I omit Kris-Way's further statement that yard jockeys spend less than half of a day's work time driving, Defendant's SMF ¶ 25, which Capalbo denies, Plaintiff's Opposing SMF ¶ 25.

[6] I omit the remainder of Defendant's SMF ¶ 28, which Capalbo denies, Plaintiff's Opposing SMF ¶ 28.

the honor system for recording his hours of work on his weekly timesheet, as there was no one present for Kris-Way to observe when he commenced work, what work he did, and when he finished work.  Defendant's SMF ¶ 29; Plaintiff's Opposing SMF ¶ 29.[7]  Kris-Way provided Capalbo with a weekly timesheet form on which Capalbo entered the number of hours he worked during each day of that week and described the work he had done that day.  *Id*. ¶ 14.  Kris-Way used the timesheets, which Capalbo turned in weekly, to calculate his pay for that week.  *Id*.

## C.  Kris-Way's Policies and Forms

The DOT regulates truck drivers involved in interstate commerce, including regulating how many hours a truck driver may work and how hours are logged.  Plaintiff's Additional SMF ¶ 74; Defendant's Reply SMF ¶ 74.  Kris-Way has written policies that require all of its drivers to maintain driver's logs mandated by the DOT.  Defendant's SMF ¶ 2; First Farrin Aff. ¶ 6.[8]

Kris-Way provides all of its drivers with logbooks in which to record one month of work. Defendant's SMF ¶ 3; First Farrin Aff. ¶ 9.[9]  The logbooks provided to Capalbo contained descriptions of federal DOT regulations on hours of work and driving and described how to fill out the logs.  Defendant's SMF ¶ 12; Plaintiff's Opposing SMF ¶ 12.[10]  The blank logbooks provided to Capalbo had a perforated blue original and a yellow carbon copy for each day. Defendant's SMF ¶ 13; First Farrin Aff. ¶ 9.  The driver was to turn in to Kris-Way the original of his logs no less than weekly.  *Id*.  The second page remained in the book.  *Id*.  The submitted log page was scanned by Kris-Way, and an electronic record created.  *Id*.[11]

---

[7] I omit Defendant's SMF ¶ 30, which Capalbo denies, Plaintiff's Opposing SMF ¶ 30.
[8] Although Capalbo denies this paragraph, Plaintiff's Opposing SMF ¶ 2, his assertions do not controvert the portion set forth above.
[9] I omit portions of Defendant's SMF ¶ 3 that are not supported by the citation given.
[10] I omit Capalbo's qualification, Plaintiff's Opposing SMF ¶ 12, which is not supported by the citation given.
[11] Capalbo in effect qualifies paragraph 13, Plaintiff's Opposing SMF ¶ 13, asserting that Kris-Way never required him to fill out a log for his yard jockey work, but only when he went "on the road[,]" Deposition of Kevin J. Capalbo ("Capalbo Dep.) (Docket No. 22-1), attached to Defendant's SMF, at 80.

6

Capalbo had training in, and was familiar with, the DOT regulations governing daily and weekly hours that a driver may spend working and driving.  Defendant's SMF ¶ 5; Plaintiff's Opposing SMF ¶ 5.  Capalbo was familiar with the DOT regulations requiring the maintenance of daily logs recording all of the driver's activities, whether driving, working but not driving, inspecting the vehicle, taking breaks, or being off duty.  *Id*. ¶ 6.[12]  Capalbo knew that the DOT regulations required, when he was "over the road[,]" that he maintain in his possession that day's daily log and daily logs for the previous seven days, so that his compliance with the DOT daily and weekly rules could be determined at any time.  Defendant's SMF ¶ 7; Capalbo Dep. at 94-95.[13]  Capalbo was aware that he was subject to DOT regulations even while he was engaged in yard jockeying.  Defendant's SMF ¶ 26; Capalbo Dep. at 62, 76-77.[14]

Capalbo understood that it was a federal crime to violate the DOT regulations concerning maintaining accurate driving logs and not exceeding allowed work hours and to falsify those logs.  Defendant's SMF ¶ 9; Plaintiff's Opposing SMF ¶ 9.[15]

Kris-Way provided Capalbo with the Kris-Way Driver's Handbook, which described the number of hours a driver could work and could drive during a day and a week and required that the driver know and comply with the DOT regulations governing such restrictions.  Defendant's

---

[12] Capalbo qualifies this statement, asserting that Kris-Way did not require yard jockeys to record time spent while working in the "yard."  Plaintiff's Opposing SMF ¶ 6; Transcript of Deposition of Sidney P. Lord ("Lord Dep.") (Docket No. 34-10), Exh. 12 to Affidavit of Guy Loranger ("Loranger Aff.") (Docket No. 34), at 49, 52-53; Capalbo Dep. at 80.

[13] I have modified Defendant's SMF ¶ 7 to reflect that, in the cited portion of his deposition, Capalbo acknowledged that this requirement applied when he was "over the road[.]"  Capalbo Dep. at 94.  Although Capalbo denies paragraph 7, Plaintiff's Opposing SMF ¶ 7, the material that he cites fails to controvert the statement as modified.  I omit Defendant's SMF ¶ 8, which is neither admitted nor supported by the citations given.

[14] Although Capalbo denies this paragraph, Plaintiff's Opposing SMF ¶ 26, the material that he cites fails to controvert the portion set forth above.

[15] Capalbo qualifies this statement, asserting, in cognizable part, that when he called Farrin to inform him that he was approaching working 14 hours, Farrin told him to keep working.  Plaintiff's Opposing SMF ¶ 9; Capalbo Dep. at 53.  His qualification is otherwise unsupported by the citations given.

SMF ¶ 15; First Farrin Aff. ¶ 6; Capalbo Dep. at 38.[16]  Capalbo acknowledged receipt of the Driver's Handbook and confirmed that he agreed to read it and to review any questions that he might have with his manager.  Defendant's SMF ¶ 16; Plaintiff's Opposing SMF ¶ 16.  Kris-Way told Capalbo in writing and orally that he shared the responsibility for monitoring his hours and that he was to notify his supervisor whenever he was in danger of violating DOT regulations regarding the maximum hours of work or driving hours.  *Id.* ¶ 17.[17]

### D.  Capalbo's January 2008 Maine Department of Labor Complaint

In January 2008, Capalbo filed a complaint with the Maine Department of Labor ("MDOL") concerning inadequate pay for overtime.  Plaintiff's Additional SMF ¶ 13; Defendant's Reply SMF ¶ 13.  Capalbo believed that he deserved to be paid for hours worked in excess of 40 per week because he drove locally.  *Id.* ¶ 14.[18]

Kris-Way was aware that Capalbo had filed a complaint with the MDOL.  Defendant's SMF ¶ 32; Plaintiff's Opposing SMF ¶ 32.  The MDOL investigated Kris-Way concerning Capalbo's wage complaint, concluded that he was being properly paid, and informed both Kris-Way and Capalbo of its conclusion.  Defendant's SMF ¶ 33; First Farrin Aff. ¶ 18.  Kris-Way had reviewed the yard jockey position in 2006 and had found it to be in compliance with MDOL regulations and exempt from overtime.  *Id.*[19]

---

[16] Although Capalbo denies this, Plaintiff's Opposing SMF ¶ 15, his assertions do not controvert it.
[17] Capalbo qualifies this statement, asserting, in cognizable part, that when he informed Farrin that he was approaching his limit on work hours in a day, Farrin told him that he had to stay at the yard because there was no one else to replace him at the yard.  Plaintiff's Opposing SMF ¶ 17; Capalbo Dep. at 53.
[18] I omit Plaintiff's Additional SMF ¶ 15, which is neither admitted nor supported by the citation given.
[19] I omit the remainder of Defendant's SMF ¶ 33, as well as Defendant's SMF ¶ 34, which Capalbo denies.  Plaintiff's Opposing SMF ¶¶ 33-34.

### E.  Capalbo's Use of Logs

From July 2006 to January 2008, Capalbo never turned in a log.  Plaintiff's Additional SMF ¶ 2; Defendant's Reply SMF ¶ 2.[20]  Kris-Way never required Capalbo to fill out a log for yard work.  Plaintiff's Additional SMF ¶ 29; Capalbo Dep. at 80.[21]  James Ryan, the Vice-President of Operations, did not believe that, prior to January 2008, yard jockeys were required to maintain regular drivers' logs.  Plaintiff's Additional SMF ¶ 11; Defendant's Reply SMF ¶ 11.[22]  Kris-Way's description of the yard jockey position duties does not include the need to keep a log.  Id. ¶ 12.  Capalbo knows that an interstate driver, someone who does not drive locally, needs to keep a log book.  Id. ¶ 26.

Sidney Lord also worked as a yard jockey for Kris-Way.  Id. ¶ 19.[23]  Lord testified that he also was instructed by Farrin not to log his hours working as a yard jockey.  Id. ¶ 20.[24]  Farrin told Lord that he did not believe that DOT regulations required Lord to keep a log for the work as a yard jockey.  Plaintiff's Additional SMF ¶ 21; Affidavit of Sidney Lord ("Lord Aff.") (Docket No. 34-9), Exh. 11 to Loranger Aff., ¶ 2.[25]  Farrin also told Lord that, even if DOT regulations did require him to keep a log while working as a yard jockey, it would be impossible

---

[20] I omit Capalbo's further statements that (i) throughout his employment, he did not maintain a log for the work he did as a yard jockey, Plaintiff's Additional SMF ¶ 27, and (ii) he only recorded a log when he was driving over-the-road, because yard work did not require him to fill out a log, id. ¶ 28.  While he cites his deposition testimony in support of that proposition, Kris-Way points out, and offers evidence, that Capalbo's own logs reveal that he did maintain a log for his yard jockey work on several occasions.  Defendant's Reply SMF ¶¶ 27-28; Affidavit of Clayton Farrin ("Second Farrin Aff.") (Docket No. 42) ¶ 17 & Exh. 5 (Docket No. 42-5) thereto.
[21] Kris-Way denies this, Defendant's Reply SMF ¶ 29, but I view the evidence in the light most favorable to Capalbo as nonmovant.
[22] My recitation incorporates Kris-Way's qualification.
[23] Kris-Way qualifies this statement, Defendant's Reply SMF ¶ 19, asserting that Lord worked as a yard jockey on and off, but not consistently, and was primarily an over-the-road driver who filled in on yard jockey responsibilities sometimes in 2008 and after Capalbo was fired.  Defendant's Reply SMF ¶ 19; Second Farrin Aff. ¶ 6.
[24] Kris-Way qualifies this statement, asserting that Lord testified that Farrin told him "that I was not to keep a logbook while I worked as a yard jockey because he did not think DOT rules required me to keep one."  Defendant's Reply SMF ¶ 20; Lord Dep. at 112.  Lord also testified that he had to do logs whenever he was engaged in interstate commerce or was driving a "big rig."  Defendant's Reply SMF ¶ 20; Lord Dep. at 21, 53.  He admits that he turned in a log for every day he drove as a yard jockey.  Defendant's SMF ¶ 20; Lord Dep. at 27, 114.
[25] Kris-Way denies this, Defendant's Reply SMF ¶ 21, but I view the evidence in the light most favorable to Capalbo as nonmovant.

to stay within the DOT hours of service rules.  Plaintiff's Additional SMF ¶ 22; Lord Aff. ¶ 2.[26]
Lord never logged his hours while working in the yard.  Plaintiff's Additional SMF ¶ 23; Lord
Aff. ¶ 2.[27]

Capalbo injured himself and damaged a truck in February 2008.  Defendant's SMF ¶ 66;
Capalbo Dep. at 31-34.[28]  He was out of work from February 14, 2008, to March 3, 2008.
Plaintiff's Additional SMF ¶ 31; Defendant's Reply SMF ¶ 31.  He was allowed to return first on
light duty and then on full duty.  Defendant's SMF ¶ 66; Capalbo Dep. at 33.[29]  Upon his return
to work from the injury, he asked to begin occasionally driving "over the road" in order to reduce
his hours.  Plaintiff's Additional SMF ¶ 32; Defendant's Reply SMF ¶ 32.  He was working too
many hours in the yard.  *Id*.  Kris-Way agreed.  *Id*.  Accordingly, a handful of days a month,
Capalbo would drive truckloads to Springfield, Massachusetts, or Vermont.  *Id*.[30]  "Over the
road" meant driving out of state to Country Kitchen facilities in Springfield, Massachusetts, or
Vermont.  *Id*. ¶ 33.  When Capalbo made those trips, he always kept his logs.  Plaintiff's
Additional SMF ¶ 34; Capalbo Dep. at 66.[31]

---

[26] Kris-Way denies this, Defendant's Reply SMF ¶ 22, but I view the evidence in the light most favorable to Capalbo as nonmovant.

[27] Kris-Way denies this, Defendant's Reply SMF ¶ 23, but I view the evidence in the light most favorable to Capalbo as nonmovant.

[28] I omit Kris-Way's further assertion that these injuries and damages were due to Capalbo's negligence, Defendant's SMF ¶ 66, which is neither admitted nor supported by the citation given.  Capalbo testified that he rolled his truck over, an occurrence that may or may not have been attributable to any negligence on his part. Capalbo Dep. at 31.

[29] I omit Kris-Way's further assertion that Capalbo could have been, but was not, terminated at that time, Defendant's SMF ¶ 66, which is neither admitted nor supported by the citation given.

[30] Kris-Way qualifies paragraph 32, stating that Capalbo did not say that he was working too many hours in the yard, Second Farrin Aff. ¶ 18, and that Capalbo's records disclose that he drove over the road at least five days in March, six days in April, 10 days in May, and three days in August 2008, Exh. 1 (Docket No. 42-1) to Second Farrin Aff.

[31] Kris-Way objects to this statement on the basis that Capalbo submitted an errata sheet in which he inappropriately attempted to alter his direct testimony that on many days when he drove over the road, he failed to keep logs. Defendant's Reply SMF ¶ 34.  The objection is overruled.  Capalbo cites to his deposition testimony, not to his errata sheet.  Plaintiff's Additional SMF ¶ 34.  Kris-Way alternatively denies the statement, Defendant's Reply SMF ¶ 34, but I view the evidence in the light most favorable to Capalbo as nonmovant.

Heath Edwards, another Kris-Way driver, filled in as a yard jockey in February 2008. Plaintiff's Additional SMF ¶ 35; Defendant's Reply SMF ¶ 35.  Although his timecard reflects that, on February 10, 2008, he worked 13 hours as a yard jockey, he did not log any hours worked for that day.  *Id*.

Capalbo was the only driver employed by Kris-Way who, during the period that he worked for Kris-Way, did not regularly turn in required DOT driver's logs.  Defendant's SMF ¶ 20; First Farrin Aff. ¶ 25.[32]  Kris-Way's records show that it only received daily driver's logs from Capalbo for the period May 4 through May 30, 2008.  Defendant's SMF ¶ 21; First Farrin Aff. ¶¶ 23, 25.[33]  Capalbo claims that all of the driver's logs that he has produced were turned in to Kris-Way, and that Kris-Way must have lost the logs for the days in March, April, and August 2008.  Defendant's SMF ¶ 23; Plaintiff's Opposing SMF ¶ 23.[34]  There were time periods during which Capalbo did not maintain copies of his daily driving logs for the prior seven days. Defendant's SMF ¶ 19; Capalbo Dep. at 95-96.[35]

**F.  Capalbo's Reports to Supervisors Regarding Hours Worked**

Capalbo worked a significant number of hours as a yard jockey, often beginning his day at 4 a.m. and not leaving until 6 p.m., working up to and in excess of 14 hours per day. Plaintiff's Additional SMF ¶ 76; Defendant's Reply SMF ¶ 76.[36]  Capalbo claims that, on several occasions when he was working as the yard jockey, he reported to his supervisor, Clayton Farrin,

---

[32] Although Capalbo denies this statement, Plaintiff's Opposing SMF ¶ 20, the materials that he cites fail to controvert it.
[33] Although Capalbo denies this statement, Plaintiff's Opposing SMF ¶ 21, the materials that he cites fail to controvert it.
[34] I omit Defendant's SMF ¶ 18, which Capalbo denies, Plaintiff's Opposing SMF ¶ 18, as well as Plaintiff's Additional SMF ¶ 58, which is neither admitted nor supported by the citation given.
[35] Although Capalbo denies this, Plaintiff's Opposing SMF ¶ 19, the materials that he cites fail to controvert the portion set forth above.
[36] Kris-Way qualifies this statement, asserting that Capalbo did frequently work significant hours in a workday but did not frequently exceed 14 hours.  Defendant's Reply SMF ¶ 76; First Farrin Aff. ¶¶ 37-39.

11

or to Fred Wheeler, Kris-Way's dispatcher, that he was approaching the limit on the number of hours that he could work that day, and Kris-Way responded that it had no one to replace him and he would have to complete the work that day.  Defendant's SMF ¶ 35; Plaintiff's Opposing SMF ¶ 35.[37]

At no time did Capalbo refuse or fail to complete his yard jockey work at Country Kitchen, regardless of the hours he was working.  *Id.* ¶ 36.  There were many times when Capalbo exceeded the number of hours that he was allowed to work in a day.  Plaintiff's Additional SMF ¶ 5; Defendant's Reply SMF ¶ 5.

When Capalbo was approaching the limit in hours he was allowed to work in a day he would call Clayton Farrin or Fred Wheeler, who were both dispatching.  Plaintiff's Additional SMF ¶ 6; Capalbo Dep. at 52.[38]  Capalbo also complained to Ryan that he was working too many hours.  Plaintiff's Additional SMF ¶ 7; Capalbo Dep. at 113.  Ryan would refer Capalbo to Farrin.  *Id.*[39]  Capalbo would explain that he was running out of hours.  Plaintiff's Additional SMF ¶ 8; Capalbo Dep. at 53.  However, Farrin told him that he had to stay at the yard and finish the job because there was no one who could replace him in the yard.  *Id.*[40]  Capalbo had to work excessive hours because he needed the job to support his family.  Plaintiff's Additional SMF ¶ 9;

---

[37] Capalbo further asserts that he complained to Farrin that he had to work hours in excess of the legal limit in a day.  Plaintiff's Additional SMF ¶ 25.  In the cited portion of his deposition testimony, Capalbo agreed with an attorney's statement that he had testified earlier that he complained to Farrin "about having to work hours in excess of the legal limit in a  day[.]"  Capalbo Dep. at 112.  However, as Kris-Way notes, Defendant's Reply SMF ¶ 25, the underlying testimony was that Capalbo would report to Farrin that he was approaching his limit in allowable hours, and Farrin would direct Capalbo to keep working because Kris-Way had no one to replace him, Capalbo Dep. at 53.
[38] Kris-Way denies this, Defendant's Reply SMF ¶ 6, but I view the evidence in the light most favorable to Capalbo as nonmovant.
[39] Kris-Way denies paragraph 7, Defendant's Reply SMF ¶ 7, but I view the evidence in the light most favorable to Capalbo as nonmovant.
[40] Kris-Way denies paragraph 8, Defendant's Reply SMF ¶ 8, but I view the evidence in the light most favorable to Capalbo as nonmovant.

Capalbo Dep. at 54.[41]   Capalbo would notify Paul and Mike, his immediate supervisors at the bakery yard, that he was about to exceed his hours.   Plaintiff's Additional SMF ¶ 10; Defendant's Reply SMF ¶ 10.  They would instruct him to call Kris-Way so that someone could replace him. *Id*.  Kris-Way never sent anyone. *Id*.[42]

Lord would also notify Farrin when he was approaching the limit on his hours, and Farrin would tell him to do his job.  Plaintiff's Additional SMF ¶ 24; Lord Dep. at 75.[43]  Lord testified that Kris-Way would keep truck drivers working even if they were up against their hours. Plaintiff's Additional SMF ¶ 66; Defendant's Reply SMF ¶ 66.  The first time that Lord worked in the yard, he called Farrin to notify him that he was reaching his limit on hours, and Farrin told him, "Don't worry about keeping a log in that yard.  You don't have to keep a log in that yard." Plaintiff's Additional SMF ¶ 67; Lord Dep. at 84, 86.[44]

At no time did Capalbo complain to any entity, such as the MDOL or the DOT, that he was required to work in excess of the federally allowed work time.  Defendant's SMF ¶ 37; Plaintiff's Opposing SMF ¶ 37.  There is no record of Capalbo advising Kris-Way that he was approaching or about to exceed the federally permitted work hours or that he ever raised any complaint of any kind with anyone about working in excess of the federally permitted work hours.  Defendant's SMF ¶ 38; First Farrin Aff. ¶ 8.[45]

---

[41] Kris-Way denies this, Defendant's Reply SMF ¶ 9, but I view the evidence in the light most favorable to Capalbo as nonmovant.

[42] Kris-Way qualifies this statement, Defendant's Reply SMF ¶ 10, asserting that Capalbo never contacted Farrin regarding exceeding legally-allowed work hours, Second Farrin Aff. ¶ 3.

[43] Kris-Way denies this, Defendant's Reply SMF ¶ 24, but I view the evidence in the light most favorable to Capalbo as nonmovant.

[44] Kris-Way denies this, Defendant's Reply SMF ¶ 67; however, I view the evidence in the light most favorable to Capalbo as nonmovant.

[45] Although Capalbo denies this, Plaintiff's Opposing SMF ¶ 38, his assertions do not controvert that there is no record of such complaints.

Capalbo's time records show that virtually all of the days on which he claimed that he worked in excess of the 14 hours allowed by the DOT occurred in the middle of 2007 and, on average, he worked about one excess hour on those days. Defendant's SMF ¶ 63; First Farrin Aff. ¶ 37.[46] Capalbo worked a total of 11½ hours in excess of the DOT-allowed work hours in 2008. Defendant's SMF ¶ 59-1; First Farrin Aff. ¶ 38.[47] Capalbo's time records do not show that he ever drove for more than the DOT-allowed numbers in a day or week. Defendant's SMF ¶ 64; First Farrin Aff. ¶ 39.[48]

Farrin claims that, throughout Capalbo's employment, Capalbo had trouble observing DOT hour limitations. Plaintiff's Additional SMF ¶ 45; Defendant's Reply SMF ¶ 45. However, Farrin never disciplined Capalbo for not observing DOT hour limitations. *Id*.

## G. 2008 DOT Audits

In May 2008, the DOT notified Kris-Way that it would conduct a compliance review of Kris-Way's South Portland truck operations based upon a computer-generated accident frequency report. Defendant's SMF ¶ 39; First Farrin Aff. ¶ 25. Kris-Way was surprised, as it has a very good safety record. *Id*. During the audit, both Kris-Way and the DOT determined that most of the recorded accidents giving rise to the audit were not those of Kris-Way's drivers, but of drivers of trucks leased from Kris-Way, which were recorded under Kris-Way's DOT number because Kris-Way owned the trucks. *Id*.[49]

---

[46] Although Capalbo denies this, Plaintiff's Opposing SMF ¶ 63, his assertions do not controvert that his time records showed this.

[47] Kris-Way mistakenly repeats paragraph number 59 between paragraph numbers 63 and 64, albeit with a different substantive content. Defendant's SMF at 10-11. For the sake of clarity, I have renamed its second paragraph 59 "59-1."

[48] Capalbo both admits and denies this statement. Plaintiff's Opposing SMF ¶ 64. Assuming that he meant to deny it, none of his allegations controvert it.

[49] Capalbo denies that the audit was triggered by a computer-generated accident frequency report, stating that the DOT remarked that "the review was initiated due to the fact that the company was subject of a complaint." (*continued on next page*)

14

In preparing for the DOT's compliance review, Kris-Way reviewed the status of its South Portland-based drivers' logs. Defendant's SMF ¶ 40; First Farrin Aff. ¶ 25. Farrin performed the review because the dispatcher, whose job it was to obtain, enter, and monitor logs on a weekly basis, was on medical leave with heart trouble. *Id.*[50]

The DOT conducted its audit of Kris-Way's South Portland office and gave Kris-Way a satisfactory rating based on the audit, indicating that Kris-Way has adequate safety management controls as required by federal law. Defendant's SMF ¶ 41; Plaintiff's Opposing SMF ¶ 41.[51]

In August 2008, the DOT notified Country Kitchen that it would conduct a compliance review of Country Kitchen's operations on September 3, 2008, at its Auburn and Lewiston facilities. *Id.* ¶ 42. As a result, Country Kitchen notified Kris-Way that it needed to have available Kris-Way's records for its drivers who worked for Country Kitchen for the prior six months. *Id.*[52] Farrin began to look through the logbooks that Kris-Way had received from its drivers in August 2008 because he was notified of an upcoming DOT audit. Plaintiff's Additional SMF ¶ 54; Deposition of Clayton L. Farrin ("Farrin Dep.") (Docket No. 34-11), Exh. 13 to Loranger Aff., at 43-44.[53]

Farrin admits that he did not provide the DOT with the logs of all of Kris-Way's drivers. Plaintiff's Additional SMF ¶ 55; Defendant's Reply SMF ¶ 55. Farrin, however, claims in his affidavit that at the time he fired Capalbo, he was already in the process of making all of Kris-

---

Plaintiff's Opposing SMF ¶ 39. However, the material that he cites does not support that proposition. Exh. 4 (Docket No. 34-3) to Loranger Aff.
[50] I omit Kris-Way's further statement that it determined that all South Portland-based drivers had regularly turned in their daily driving logs for the preceding six months, Defendant's SMF ¶ 40, which Capalbo denies, Plaintiff's Opposing SMF ¶ 40.
[51] I omit Capalbo's qualification of this statement, Plaintiff's Opposing SMF ¶ 41, which is not supported by the citation given.
[52] I omit Defendant's SMF ¶ 43, which Capalbo denies, Plaintiff's Opposing SMF ¶ 43, as well as Plaintiff's Additional SMF ¶ 53, which is neither admitted nor supported by the citation given.
[53] Kris-Way denies this in part, Defendant's Reply SMF ¶ 54, but I view the evidence in the light most favorable to Capalbo as nonmovant.

Way's records available to the DOT. *Id.* ¶ 56. Farrin knew that one of the purposes of the DOT

audit was to make sure that all of the logs were accurate. *Id.* ¶ 57. He did not turn in any records

that were not requested by the DOT, regardless of whether they were accurate or inaccurate.

*Id.*[54]

### H. Capalbo's Discharge From Employment

In early August 2008, Capalbo turned in his log for the first part of August. Plaintiff's

Additional SMF ¶ 50; Capalbo Dep. at 120. He turned the logs into the office box. *Id.* He does

not know what Kris-Way did with his log entries after he turned them in. *Id.*[55] Capalbo had also

turned in logs for April and May, but does not know what Kris-Way did with them after he

dropped them off in the box. Plaintiff's Additional SMF ¶ 51; Errata Sheet of Kevin J. Capalbo

("Errata Sheet") (Docket No. 44-4). He believes that Kris-Way must have lost the logs. *Id.*[56]

On August 18, 2008, Capalbo's supervisor, Farrin, asked him where all his daily driver's

logs were and asked for the August 2008 logs. Defendant's SMF ¶ 44; Plaintiff's Opposing

SMF ¶ 44. Capalbo told Farrin that he had completed and turned in his driver's logs for the first

two weeks of August 2008 and that Kris-Way must have lost them. *Id.* ¶ 45. Farrin expected

Capalbo to make copies of the logs that Capalbo claimed to have already submitted. Defendant's

SMF ¶ 46; First Farrin Aff. ¶ 26. Capalbo admits that if he had previously done the logs and

---

[54] My recitation incorporates Kris-Way's qualifications.

[55] Kris-Way denies paragraph 50, Defendant's Reply SMF ¶ 50, however, I view the evidence in the light most favorable to Capalbo as nonmovant.

[56] Kris-Way complains that Capalbo tries with his errata sheet to reverse his sworn testimony that he did not even prepare logs for several of the days when he was driving over the road. Defendant's Reply SMF ¶ 51. However, Kris-Way identifies no basis for striking the underlying statement. *Id.* In any event, as a general matter, it is not impermissible on summary judgment to rely on a revision of sworn deposition testimony set forth in an errata sheet prepared in accordance with the requirements of Federal Rule of Civil Procedure 30(e), even if the original answer remains part of the record. *See, e.g., Combined Energies v. CCI, Inc.*, 628 F. Supp.2d 226, 232 n.4 (D. Me. 2009); *Elwell v. Conair, Inc.*, 145 F. Supp.2d 79, 86-87 (D. Me. 2001). To the extent that Kris-Way denies the statement, Defendant's Reply SMF ¶ 51, I view the evidence in the light most favorable to Capalbo as nonmovant.

turned in the originals, he should have been able to make copies of the logs he retained. Defendant's SMF ¶ 46; Capalbo Dep. at 120.[57]

Farrin first asked Capalbo to recreate six months of logs.  Plaintiff's Additional SMF ¶ 40; Capalbo Dep. at 108.  Farrin then requested that Capalbo recreate only the logs for the previous weeks in August 2008.  Plaintiff's Additional SMF ¶ 41; Capalbo Dep. at 108-09.[58] Capalbo complained to Farrin that he believed that it would be illegal to recreate a logbook. Plaintiff's Additional SMF ¶ 42; Affidavit of Kevin Capalbo ("Capalbo Aff.") (Docket No. 35-1), attached to Plaintiff's Additional SMF, ¶ 2.[59]  Capalbo asked Farrin for his timecards so that he could accurately recreate his log.  Plaintiff's Additional SMF ¶ 43; Capalbo Dep. at 104-05.[60] Farrin would not give Capalbo his timecards.  Plaintiff's Additional SMF ¶ 44; Capalbo Dep. at 105, 119.[61] After Farrin requested Capalbo's logs, Capalbo had no further conversation with him until a meeting on August 20, 2008.  Plaintiff's Additional SMF ¶ 49; Capalbo Dep. at 109.[62]

On August 19, 2008, Farrin reported to his supervisor, Ryan, Kris-Way's Vice-President of Operations, that Capalbo was the only Auburn driver who had not been regularly filling out and turning in his daily logs.  Defendant's SMF ¶ 47; First Farrin Aff. ¶¶ 27-28; Ryan Aff. ¶¶ 10-11.  Farrin told Ryan that Capalbo had said that he had turned in his daily logs for the first two weeks of August but that Farrin had looked and had not found any logs from Capalbo.  *Id.*

---

[57] Although Capalbo denies paragraph 46, Plaintiff's Opposing SMF ¶ 46, his assertions do not controvert the portions set forth above.

[58] Kris-Way complains of inconsistencies in Capalbo's sworn deposition testimony but identifies no basis on which to strike paragraphs 40 and 41.  Defendant's Reply SMF ¶¶ 40-41.  To the extent that Kris-Way denies the statements, *id.*, I view the evidence in the light most favorable to Capalbo as nonmovant.

[59] Kris-Way denies this, Defendant's Reply SMF ¶ 42, but I view the evidence in the light most favorable to Capalbo as nonmovant.

[60] Kris-Way denies this, Defendant's Reply SMF ¶ 43, but I view the evidence in the light most favorable to Capalbo as nonmovant.

[61] I omit the balance of paragraph 44, Plaintiff's Additional SMF ¶ 44, which is neither admitted nor supported by the citation given.  Kris-Way denies this paragraph, Defendant's Reply SMF ¶ 44, but I view the evidence in the light most favorable to Capalbo as nonmovant.

[62] Kris-Way denies this, Defendant's Reply SMF ¶ 49, however, I view the evidence in the light most favorable to Capalbo as nonmovant.

Farrin also reported to Ryan that, because he had had to speak to Capalbo in the past about not turning in his daily logs, he doubted that Capalbo had turned in the August daily logs.  *Id.*[63]

Ryan and Farrin agreed to go to Auburn on August 20, 2008, to meet with Capalbo to review his August daily logs and for Ryan to inform Capalbo that he absolutely had to complete and timely turn in his daily logs.  Defendant's SMF ¶ 48; First Farrin Aff. ¶¶ 28-29; Ryan Aff. ¶ 12.[64]  On August 20, 2008, Farrin and Ryan went to Kris-Way's Auburn facility and met Capalbo.  Defendant's SMF ¶ 50; Plaintiff's Opposing SMF ¶ 50.[65]

At the meeting, Ryan asked Capalbo if he had his logs for the first two weeks of August.  *Id.* ¶ 51.  Capalbo replied that he did, that they were in his truck, and that he would get them.  *Id.*  Capalbo went to his truck, returned, and delivered to Ryan a logbook that he represented contained his logs for the first 20 days of August 2008.  *Id.* ¶ 52.  The logbook contained both the first and second pages for each day, meaning that none of the logs had been turned into Kris-Way as Capalbo had stated.  *Id.*[66]

Ryan did a quick comparison of the logs Capalbo had given him against the timecards Capalbo had turned in for his work on the same days.  *Id.* ¶ 53.  The logs for the first two weeks of August did not match Capalbo's time records for those weeks.  *Id.* ¶ 54.  Capalbo had indicated in his daily logs that he had been doing work and working during hours and at locations that differed from those he had indicated on his timecards for the same days.  *Id.*  Ryan

---

[63] Capalbo in effect qualifies this statement, denying that (i) he failed to turn in required logs, (ii) he did not turn in the logs for the first two weeks of August 2008, and (iii) Farrin had previously spoken to him about not turning in his logs.  Plaintiff's Opposing SMF ¶ 47; Capalbo Dep. at 90-91, 119-20; Capalbo Aff. ¶ 2.

[64] Capalbo in effect qualifies this statement, denying that any issue existed as to his not keeping his log.  Plaintiff's Opposing SMF ¶ 48.  He asserts, in cognizable part, that Kris-Way did not require him to turn in logs, so he did not, and that, when working on the road, he kept logs.  *Id.*; Lord Dep. at 49, 53; Capalbo Dep. at 80, 95.

[65] I omit Defendant's SMF ¶ 49, which Capalbo denies, Plaintiff's Opposing SMF ¶ 49.

[66] Capalbo qualifies paragraphs 51 and 52, asserting that he retrieved the logs that he had recreated at Farrin's request, which were not the originals that he had already passed in, and that he had asked Farrin to provide him with timecards so that it would be easier to correctly redo his logs, but Farrin refused his request.  Plaintiff's Opposing SMF ¶¶ 51-52; Capalbo Dep. at 104-05.

asked Capalbo why there was a difference, and Capalbo stated that he had recreated the logs that he had given to Ryan.  *Id*. ¶ 55.

Ryan advised Capalbo that falsifying his DOT-required logs was a serious violation of federal law and a very serious matter both for him and Kris-Way if he should have an accident and be found to have improperly documented logs.  Defendant's SMF ¶ 56; First Farrin Aff. ¶ 33; Ryan Aff. ¶ 19.  Capalbo admitted that he had created the new logs.  Defendant's SMF ¶ 57; First Farrin Aff. ¶ 32; Ryan Aff. ¶ 18.  Ryan terminated Capalbo's employment for turning in false logs and representing them as his actual logs.  Defendant's SMF ¶ 58; Ryan Aff. ¶ 20; Capalbo Dep. at 16, 110.[67]  Capalbo asked how he could be fired when Farrin had told him to create the log.  Plaintiff's Additional SMF ¶ 72; Capalbo Aff. ¶ 2.[68]

Kris-Way has a progressive disciplinary program that consists of verbal warnings, written warnings, and a performance improvement plan.  Plaintiff's Additional SMF ¶ 68; Defendant's Reply SMF ¶ 68.  Capalbo's employment file did not contain any written warnings or performance improvement plans.  *Id*.  Kris-Way's disciplinary policy begins with a verbal warning for the first violation, with a copy of the verbal warning put in the employee's personnel file, and re-instruction as needed.  *Id*. ¶ 69.  The second violation gets a written warning, with a

---

[67] Capalbo in effect qualifies paragraphs 56, 57, and 58, denying that he falsified his log and asserting that he recreated the log at Farrin's order and made a couple of mistakes because Farrin would not let him see timecards to recreate the log.  Plaintiff's Opposing SMF ¶¶ 56-58; Capalbo Dep. at 104-05.

[68] I omit Capalbo's further statement that, after Farrin and Ryan reviewed the recreated logs, *Farrin* fired Capalbo for falsifying the logs.  Plaintiff's Additional SMF ¶ 72; *see also id*. ¶ 80; Plaintiff's Opposing SMF ¶ 58.  As Kris-Way points out, Defendant's Reply SMF ¶¶ 72, 80, this is not supported by the citations given.  The cited portions of Capalbo's deposition do not address his firing.  Capalbo Dep. at 104-05, 110.  The cited portion of Capalbo's affidavit indicates that Farrin and Ryan both fired him for falsifying the logbooks.  Capalbo Aff. ¶ 2.  In any event, as Kris-Way suggests, Defendant's Reply SMF ¶¶ 72, 80, Capalbo does not explain the contradiction between his sworn deposition testimony that *Ryan* fired him, Capalbo Dep. at 110; Statement of Kevin Capalbo, contained in Charge of Discrimination, Capalbo Dep. Exh. 15 (Docket No. 22-15), attached to Defendant's SMF, ¶ 6, and his statement in his affidavit that *Farrin and Ryan* both fired him.  The unexplained discrepancy justifies the disregard of the statement.  *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.").

copy of the written warning put in the employee's personnel file and a two-day suspension without pay. *Id.* The third violation is grounds for termination. *Id.*[69]

In January 2008, Farrin began keeping a secret file on Capalbo. Plaintiff's Additional SMF ¶ 16; Defendant's Reply SMF ¶ 16.[70] In January 2008, Farrin did nothing to ensure that the other yard jockeys were filling out logs. *Id.* ¶ 17.[71] In January 2008, Farrin did not discipline Capalbo for not providing logs, as he claims in his timeline. *Id.* ¶ 18.[72] Farrin did not even put together an improvement plan for Capalbo. *Id.* ¶ 47. Farrin did not document what Capalbo said during an alleged May 1, 2008, conversation that he had with Capalbo about his logs. Plaintiff's Additional SMF ¶ 48; Farrin Dep. at 61.[73]

Although Farrin claims that in 2008 he had many problems with Capalbo regarding logs and had spoken to him many times about them, on August 14, 2008, he filled out an evaluation of Capalbo in which he rated him good for the categories quality of work, cooperation with

---

[69] Kris-Way qualifies paragraphs 68 and 69, asserting that its policies provide that it may elect to use any or none of several different forms of discipline, including immediate termination, which is the disciplinary measure listed for falsification of logbooks. Defendant's Reply SMF ¶¶ 68-69; Second Farrin Aff. ¶ 13 & Exh. 3 (Docket No. 42-3) thereto at 13. Capalbo admits that he received and read these policies. Defendant's Reply SMF ¶ 68; Capalbo Dep. at 37. I omit Plaintiff's Additional SMF ¶ 73, which is neither admitted nor supported by the citation given.

[70] Kris-Way qualifies this statement, asserting that Farrin had been advised by Kris-Way's dispatcher that Capalbo was not timely filling out or turning in his driver log records. Defendant's Reply SMF ¶ 16; Farrin Dep. at 40, 59-60. I omit Kris-Way's further qualification that, although the contemporaneous computer entries were not shared with Capalbo, the information was no secret because Farrin spoke on each occasion with Capalbo concerning the facts that were subsequently recorded, Defendant's Reply SMF ¶ 16, which Capalbo elsewhere denies, Plaintiff's Opposing SMF ¶ 30.

[71] Kris-Way qualifies this statement, asserting that it is undisputed that all other yard jockeys were turning in logs for all work that they were engaged in. Defendant's Reply SMF ¶ 17; First Farrin Aff. ¶¶ 21, 25.

[72] I omit Kris-Way's qualifications, Defendant's Reply SMF ¶ 18, which Capalbo denies, Plaintiff's Additional SMF ¶ 18; *see also* Plaintiff's Opposing SMF ¶ 30.

[73] Although Capalbo states that Farrin did not document what was said "during any of the alleged conversations" between them, Plaintiff's Additional SMF ¶ 48, the cited portion of Farrin's deposition transcript refers only to Farrin's failure to document what Capalbo said during an alleged May 1, 2008, conversation. I have altered the wording accordingly.

others, safety habits, personal habits, driving skills, and attitude, with no mention of disregard for logs or hours of service.  Plaintiff's Additional SMF ¶ 79; Defendant's Reply SMF ¶ 79.[74]

Capalbo is the only yard jockey whom Kris-Way has fired for falsifying logs.  Plaintiff's Additional SMF ¶ 75; Defendant's Reply SMF ¶ 75.  Yet, there are also discrepancies between the logbooks and timecards of Lord.  Plaintiff's Additional SMF ¶ 78; Exh. 7 (Docket No. 34-6) to Loranger Aff.  On January 6, 2008, Lord logged that he was off duty.  *Id*.  Yet, his timecard shows that he was working as a yard jockey for Country Kitchen.  *Id*.  The same inaccuracy occurred on February 17, February 18, February 24, February 25, March 19, April 9, April 16, April 23, May 7, May 8, May 19, May 26, July 20, and July 21.  *Id*.  In fact, from January to August 2008, Lord did not once log his hours worked as a yard jockey.  *Id*.[75]

Prior to 2001, James Ryan was the Transportation Manager and was responsible for Kris-Way's drivers.  Defendant's SMF ¶ 10; Ryan Aff. ¶ 1.  In that role, Ryan had previously terminated four other drivers for falsifying logbooks.  Defendant's SMF ¶ 10; Ryan Aff. ¶ 6.[76] At the time that Ryan terminated Capalbo's employment, Ryan was not aware that other yard

---

[74] Kris-Way qualifies paragraph 79, Defendant's Reply SMF ¶ 79, asserting that Farrin's statements, made in a form provided by Capalbo to assist Capalbo in his efforts to buy his own tractor, were made before Farrin learned that Capalbo had not submitted any logs for June, July, or the first part of August and after Capalbo had started submitting logs in early May, Second Farrin Aff. ¶ 15.

[75] Kris-Way denies paragraph 78, but does not contest the existence of the recited discrepancies between Lord's logs and timecards.  Defendant's Reply SMF ¶ 78.  Instead, it asserts that Lord turned in logs every day that he worked as a yard jockey, Lord Dep. at 114, and that his failure to record his time properly was not discovered by Farrin or Ryan until Kris-Way reviewed all yard jockeys' logs in preparing its response to Capalbo's MHRC complaint, which was filed on October 28, 2008, more than two months after Capalbo's discharge, First Farrin Aff. ¶ 41; Ryan Aff. ¶ 21.

[76] Capalbo denies this sentence on the bases that Ryan's statement in his affidavit is conclusory and that when, in discovery, Kris-Way was asked to identify employees who had been terminated for the same reason as Capalbo, it stated that it had "not terminated any other employee for falsifying time records and lying about having previously submitted logs."  Plaintiff's Opposing SMF ¶ 10; Defendant's Revised Responses to Plaintiff's Interrogatories (Docket No. 34-2), Exh. 3 to Loranger Aff., ¶ 17.  The statement in question is not conclusory and is not necessarily inconsistent with the discovery response.  Ryan avers that he had terminated four other employees for falsifying logbooks, whereas Kris-Way stated that it had not terminated any other employees for *both* falsifying time records and lying about having previously submitted logs.

jockeys for Kris-Way had not filled out their logbooks in the proper manner.  Defendant's SMF ¶ 59; Ryan Aff. ¶ 21.[77]

Capalbo filed a complaint with the Maine Human Rights Commission ("MHRC") that he had been illegally terminated from Kris-Way.  Plaintiff's Additional SMF ¶ 37; Defendant's Reply SMF ¶ 37.  He believed that he was wrongly fired because Farrin had asked him to recreate his logs and then fired him for recreating them.  Plaintiff's Additional SMF ¶ 38; Capalbo Dep. at 103.[78]

## I.   Rumors That Capalbo Had Complained to DOT

Capalbo did not know why or when the DOT's audit of Kris-Way's records was to be conducted.  Defendant's SMF ¶ 60; Capalbo Dep. at 111, 121.[79]  Capalbo did not contact the DOT and did not tell Kris-Way or anyone else that he had contacted, or was going to contact, the DOT concerning his work or anything else about Kris-Way.  Defendant's SMF ¶ 61; Plaintiff's Opposing SMF ¶ 61.  Capalbo never contacted the DOT about Kris-Way's operations or Capalbo's work at Kris-Way to complain about Kris-Way or for another purpose.  *Id.* ¶ 62.

Lord had heard rumors that Capalbo had gone to the DOT to complain about Kris-Way's violations of DOT rules.  Plaintiff's Additional SMF ¶ 59; Defendant's Reply SMF 59.[80]  Farrin told Lord that he believed that Capalbo had gone to the DOT to complain about Kris-Way, thus initiating the audit.  Plaintiff's Additional SMF ¶ 60; Lord Aff. ¶ 3.[81]  After Kris-Way fired

---

[77] Although Capalbo denies paragraph 59, Plaintiff's Opposing SMF ¶ 59, his assertions do not controvert the underlying statement.

[78] I have changed the word "illegally[,]" Plaintiff's Additional SMF ¶ 38, to "wrongly" to conform with the cited material.

[79] Although Capalbo denies this, Plaintiff's Opposing SMF ¶ 60, the material that he cites fails to controvert it.

[80] Kris-Way qualifies this statement, Defendant's Reply SMF ¶ 59, asserting that it was clear that there was no basis for such a rumor, given that Capalbo admits that he never went to the DOT or was contemplating going to the DOT about Kris-Way, Capalbo Dep. at 110, 124.

[81] Kris way denies this, Defendant's Reply SMF ¶ 60; however, I view the evidence in the light most favorable to Capalbo as nonmovant.

Capalbo, Farrin pulled Lord aside in his truck and yelled at him for not keeping a logbook for the time he spent as a yard jockey.  Plaintiff's Additional SMF ¶ 61; Lord Aff. ¶ 3.  Lord reminded Farrin that he did not keep a log while working in the yard because Farrin told him not to.  *Id*.[82] This meeting between Farrin and Lord occurred inside a pickup truck.  Plaintiff's Additional SMF ¶ 62; Lord Dep. at 118.  Lord said that the meeting was supposed to be in a building, but Farrin chose to speak to him in a pickup truck instead.  *Id*.[83]

At the meeting in the pickup truck, Farrin handed Lord a piece of paper with dates highlighted.  Plaintiff's Additional SMF ¶ 63; Lord Dep. at 118-19.  Farrin told Lord that he needed to recreate logs for the highlighted dates when he was working in the yard because the DOT was coming down on Kris-Way.  *Id*.[84]  Lord asked Farrin if Capalbo's complaint to the DOT was part of the reason why Farrin was coming down on him about his logs, and Farrin told him that it was.  Plaintiff's Additional SMF ¶ 64; Lord Aff. ¶ 3.[85]  In Farrin's affidavit, however, he claims that neither he nor anyone at Kris-Way knew that Capalbo complained or would complain to the DOT.  Plaintiff's Additional SMF ¶ 65; Defendant's Reply SMF ¶ 65.

### III.  Discussion

Capalbo claims that he was fired for engaging in protected activity, in violation of the MWPA (Count One) and the STAA (Count Two).  *See* Complaint ¶¶ 1, 14-22.  He states that he (i) complained to Farrin about the fact that he was being forced to violate DOT regulations by working excessive hours, *id*. ¶ 6, (ii) filed a complaint with the MDOL in early 2008 for failure

---

[82] Kris-Way denies paragraph 61, Defendant's Reply SMF ¶ 61; however, I view the evidence in the light most favorable to Capalbo as nonmovant.
[83] Kris-Way denies paragraph 62, Defendant's Reply SMF ¶ 62; however, I view the evidence in the light most favorable to Capalbo as nonmovant.
[84] Kris-Way denies paragraph 63, Defendant's Reply SMF ¶ 63; however, I view the evidence in the light most favorable to Capalbo as nonmovant.
[85] Kris-Way denies paragraph 64, Defendant's Reply SMF ¶ 64; however, I view the evidence in the light most favorable to Capalbo as nonmovant.

to pay him time-and-a-half for overtime work, *id.* ¶ 7, and (iii) told Farrin that he did not want to fabricate his logbook, in advance of the DOT inspection, because that was illegal, *id*. ¶ 10.

He alleges that Kris-Way terminated his employment "because he had complained about [Kris-Way's] illegal activity; because he had filed a complaint with [the] MDOL; because [Kris-Way] believed that he had reported it to [the] DOT; because [Kris-Way] believed that he was about to cooperate with the DOT in its upcoming audit; and/or because [Kris-Way] believed that he was about to file a complaint with the DOT."  *Id.* ¶ 12.

Kris-Way seeks summary judgment as to each of four "theories for recovery": that Capalbo was fired because (i) Kris-Way believed that he was "about to report" violations to the DOT and was "about to cooperate" with a pending DOT audit (the "DOT theory of recovery"), (ii) he had filed the MDOL complaint (the "MDOL theory of recovery"), (iii) he complained to his supervisor that he was working hours in excess of DOT regulations (the "excessive hours theory of recovery"), and (iv) he refused to recreate six months of logs and complained to his supervisors that fraudulently completing logbooks was illegal (the "logbook theory of recovery").  *See* Motion at 1-2; Defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment ("Reply") (Docket No. 40) at 2.[86]

### A.  The Elements of an MWPA Case

The MWPA provides, in relevant part:

**1. Discrimination prohibited.** No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:

---

[86] While Kris-Way raised its argument concerning the fourth theory of recovery, the logbook theory, for the first time in its reply brief, I do not consider it waived.  Kris-Way's failure to discern this fourth theory from the complaint is understandable: Capalbo was not clear that he considered this incident a distinct protected activity.  *See* Complaint ¶ 12.  In addition, Kris-Way joined issue, in its reply, with Capalbo's argument concerning the logbook theory of recovery.  *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Opposition") (Docket No. 31) at 2, 9, 15-16; Reply at 7-8.  Both parties thus have had an opportunity to brief this issue.

> **A.** The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States[.]

26 M.R.S.A. § 833.

"The MWPA prohibits an employer from taking adverse action against an employee who reports a suspected violation of a law or rule." *LePage v. Bath Iron Works Corp*., 2006 ME 130, ¶ 19, 909 A.2d 629, 635.  "Although the MWPA provides no private right of action, plaintiffs may file a civil action under the MHRA [Maine Human Rights Act]." *Osher v. University of Me. Sys*., 703 F. Supp.2d 51, 64 n.13 (D. Me. 2010).

"To establish a *prima facie* case of unlawful retaliation under state and federal law, [a plaintiff] must show that (1) she engaged in an activity protected by the applicable statute; (2) she suffered an adverse employment action; and, (3) the adverse employment action was causally connected to the protected activity." *Id*. at 65.  "The burden of making out a *prima facie* case is not onerous."  *Daigle v. Stulc*, __ F. Supp.2d __, No. 1:09-cv-00353-JAW, 2011 WL 2551572, at *28 (D. Me. June 27, 2011) (citations and internal quotation marks omitted).

"Following the shifting burdens analysis described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), once the plaintiff has shown a protected activity followed in close proximity by an adverse employment action, this gives rise to an inference that a causal connection is established; the employer, then, will be required to produce some probative evidence to demonstrate a nondiscriminatory reason for the adverse employment action." *LePage*, 2006 ME 130, ¶ 19, 909 A.2d at 636 (citations and internal punctuation omitted).  "The final burden to prove the existence of the causal nexus remains with the plaintiff." *Id*.  "[U]nder First Circuit authority, the Court may not consider the employer's

25

alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case." *Daigle*, 2011 WL 2551572, at *28 (citations and internal quotation marks omitted).[87]

## B.  The Elements of an STAA Case

The STAA provides, in relevant part:

**a) Prohibitions. – (1)** A person may not discharge an employee, or discipline or discriminate against an employee regarding pay, terms, or privileges of employment, because –

**(A)(i)** the employee, or another person at the employee's request, has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order, or has testified or will testify in such a proceeding; or

**(ii)** the person perceives that the employee has filed or is about to file a complaint or has begun or is about to begin a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order; [or]

***

**(D)** the employee cooperates, or the person perceives that the employee is about to cooperate, with a safety or security investigation by the Secretary of Transportation, the Secretary of Homeland Security, or the National Transportation Safety Board[.]

49 U.S.C. § 31105.  The STAA "was enacted in 1983 to encourage employee reporting of noncompliance with safety regulations governing commercial motor vehicles."  *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 258 (1987).  "Congress recognized that employees in the transportation industry are often best able to detect safety violations and yet, because they may be threatened with discharge for cooperating with enforcement agencies, they need express protection against retaliation for reporting these violations."  *Id.*

---

[87] "The MWPA analysis is guided by federal case law construing analogous statutes."  *Halkett v. Correctional Med. Servs., Inc.*, 763 F. Supp.2d 205, 220 (D. Me. 2011).

The showings required of employees and employers pursuant to the STAA are similar to those required pursuant to the MWPA:

> A prima facie case of unlawful termination under the STAA requires a showing that the employee engaged in protected activity, that the employee was subjected to adverse employment action, and that there was a causal connection between the protected activity and the adverse action.  If a complainant makes out a prima facie case, the employer may rebut that showing with evidence of a legitimate, non-retaliatory reason for the adverse employment action.  The burden then shifts back to the complainant to prove that the proffered reason is actually a pretext for unlawful retaliation.

*R & B Transp., LLC v. United States Dep't of Labor, Admin. Review Bd.*, 618 F.3d 37, 46 (1st Cir. 2010) (citations and internal quotation marks omitted).

## C.  First Theory: About To Report or Cooperate

Kris-Way seeks summary judgment as to Capalbo's first theory of recovery, the DOT theory, on grounds that (i) the MWPA provides no protection for employees who are about to report but have not actually done so, and (ii) the STAA provides no protection unless an employee is both on the verge of reporting a violation and his or her employer perceives that he is about to do so, neither of which Capalbo can establish.  *See* Motion at 14-15; Reply at 5-6.

### 1.  MWPA

Capalbo does not dispute that the DOT theory of recovery is not cognizable pursuant to the MWPA.  *See* Opposition at 2, 8.  In any event, Kris-Way is correct.  The MWPA expressly protects actual, not anticipated, oral or written reports to the employer or a public body.  *See* 26 M.R.S.A. § 833; *see also, e.g.*, *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 8, 954 A.2d 1051, 1054 ("Subsections (1)(A), (1)(C), and (2) of section 833, when read together, unambiguously limit the protection afforded by the [M]WPA to (1) employees (2) who report to an employer (3) about a violation (4) committed or practiced by that employer.") (footnote omitted).

Kris-Way accordingly is entitled to summary judgment as to Count One to the extent predicated on Capalbo's first theory of recovery, the DOT theory.

## 2.   STAA

I reach a different conclusion with respect to the viability of Capalbo's DOT theory of recovery pursuant to the STAA.  Kris-Way contends that, in order to claim the protections of the STAA, an employee must show both that (i) he or she was "on the verge" of reporting a violation *and* (ii) the employer was aware that he or she was about to do so.  *See* Motion at 9.  It seeks summary judgment as to the DOT theory of recovery on the bases that Capalbo cannot prove that he was "on the verge" of making a report to, or cooperating with, the DOT,  *see id*. at 2, or that Kris-Way had any concern that he was about to report to the DOT, *see id*. at 15.

Kris-Way acknowledges that there is no caselaw construing the meaning of the "about to file" provision of the STAA.  *See id*. at 9.  However, it argues that this court should interpret that provision in the same manner as courts construing a "nearly identical" provision in the Seaman's Protection Act and an "about to report" provision in the Michigan Whistle-Blowers' Protection Act. *See id*. at 9-11.

Kris-Way's argument is unpersuasive.  The relevant portion of the Seaman's Protection Act applies in circumstances in which "the seaman in good faith has reported or is about to report to the Coast Guard or other appropriate Federal agency or department that the seaman believes that a violation of a maritime safety law or regulation prescribed under that law or regulation has occurred[.]"  46 U.S.C. § 2114(a)(1)(A).  Similarly, the Michigan Whistle-Blowers' Protection Act applies, in relevant part, in circumstances in which an employee or a person acting on his or her behalf "reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule[.]"  Mich. Comp. Laws § 15.362.

Moreover, in Michigan, "[a]n employee shall show by clear and convincing evidence that he or she or a person acting on his or her behalf was about to report, verbally or in writing, a violation or a suspected violation[.]" *Id.* § 15.363(4).  Both statutes, hence, require that an employee actually have been "about to report" a violation to trigger liability; indeed, in Michigan, he or she must so prove by clear and convincing evidence.

The STAA is materially distinguishable, affording protection in circumstances in which an employer "*perceives* that the employee has filed or is about to file a complaint or has begun or is about to begin a proceeding related to a violation[.]"  49 U.S.C. § 31105(a)(1)(A)(ii) (emphasis added).  The statute is devoid of language requiring that an employee actually have filed, or even have been on the verge of filing, a report or complaint.

A reasonable trier of fact crediting Capalbo's evidence and drawing all reasonable inferences therefrom could conclude that Kris-Way (through supervisor Farrin) perceived that Capalbo had filed a complaint with the DOT, *see* Plaintiff's Additional SMF ¶ 60; Lord Aff. ¶ 3, and/or that Capalbo was about to file a complaint and cooperate with the DOT audit, in view of the earlier perceived complaint triggering the audit, *see id.*, and Capalbo's complaint on August 18, 2008, two days before his discharge and shortly before the DOT audit, that the requested recreation of his logbooks was illegal, *see* Plaintiff's Additional SMF ¶ 42; Capalbo Aff. ¶ 2.[88]

Accordingly, Kris-Way's bid for summary judgment as to Count Two, to the extent predicated on Capalbo's first theory of recovery, the DOT theory, must be denied.

---

[88] Kris-Way argues that Lord's testimony that Farrin told him that he (Farrin) believed that Capalbo had made a complaint that triggered the DOT audit is "incredible" and insufficient to stave off summary judgment in view of Kris-Way's undisputed evidence that Capalbo neither made nor told anyone that he planned to make a complaint to the DOT and that Kris-Way knew from the DOT that the audits in South Portland and Auburn had been triggered by something other than a complaint.  *See* Motion at 15; Reply at 5-6.  Nonetheless, it is not self-evident that a reasonable fact-finder could only conclude that Lord's testimony on this point is false.  It is possible that, despite the DOT's official explanation for the audit, Farrin could have perceived that Capalbo had triggered it by filing a complaint.

### D.  Second Theory: Filing of MDOL Complaint

Kris-Way seeks summary judgment as to Capalbo's second theory of recovery, the MDOL theory, on grounds that (i) he cannot make out a *prima facie* case of a causal link between his filing of an MDOL complaint and his firing and (ii) a wage complaint is not a protected activity pursuant to the STAA.  *See* Motion at 15-17; Reply at 2-4.

### 1.  MWPA

As Kris-Way points out, *see* Motion at 16, seven months elapsed between the filing of Capalbo's MDOL wage complaint, of which Kris-Way was aware, and Capalbo's discharge, *see* Plaintiff's Additional SMF ¶ 13; Defendant's Reply SMF ¶ 13; Defendant's SMF ¶ 32; Plaintiff's Opposing SMF ¶ 32; Defendant's SMF ¶ 58; Ryan Aff. ¶ 20.  This is too great a lapse in time to permit an inference of retaliatory termination based on timing alone.  *See, e.g*., *Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010) ("Without some corroborating evidence suggestive of causation – and there is none here – a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action."); *Paquin v. MBNA Mktg. Sys., Inc*., 233 F. Supp.2d 58, 68 (D. Me. 2002) ("Without more, a span of approximately seven months is too long to reasonably infer that one event is causally related to the other.").

Capalbo does not dispute this point of law, but rejoins that Kris-Way subjected him not only to the adverse action of employment termination in August 2008 but also to a series of adverse disciplinary actions commencing the month after the filing of the MDOL complaint.  *See* Opposition at 11.  He cites, *inter alia*, *Valentín-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 97 (1st Cir. 2006), *id*., which stands for the proposition that certain disciplinary actions short of discharge, such as letters of admonishment, can constitute adverse employment actions, *Valentín-Almeyda*, 447 F.3d at 97.

As Kris-Way observes, *see* Reply at 3, Capalbo confronts an insurmountable obstacle in relying on those alleged disciplinary actions: he denies that they occurred, *see* Plaintiff's Additional SMF ¶ 18; Defendant's Reply SMF ¶ 18; Plaintiff's Additional SMF ¶ 48; Farrin Dep. at 61. Taking him at his word, he was subjected to no adverse disciplinary actions until his discharge in August 2008. Therefore, he falls short of demonstrating the existence of a triable issue as to whether he was discharged for filing an MDOL wage complaint in January 2008, warranting summary judgment in Kris-Way's favor on Count One to the extent predicated on Capalbo's second theory of recovery, the MDOL theory.

### 2. STAA

As Kris-Way points out, and Capalbo does not dispute, wage complaints are not within the sphere of protected activities for purposes of the STAA. *See* Motion at 16; Opposition at 14-17; 49 U.S.C. § 31105(a)(1)(A)(i)-(ii) (protecting activity or perceived activity "related to a violation of a commercial motor vehicle safety or security regulation, standard, or order"); *Zurenda v. United States Dep't of Labor*, No. 98-4298, 1999 WL 459775, at *2 (2d Cir. June 22, 1999) (upholding dismissal of STAA complaint when complainant supportably was found to have been discharged not because of protected activity but rather for refusing to drive to a certain location after expressing dissatisfaction with his wages and living conditions at a company apartment).

Thus, even if Capalbo had made out a triable issue of a causative link between his filing of his MDOL complaint and his discharge, summary judgment still would be warranted as to Count Two, to the extent predicated on Capalbo's second theory of recovery, the MDOL theory, on the ground that he fails to make out a *prima facie* case that, in filing his MDOL complaint, he engaged in a protected activity for purposes of the STAA.

Kris-Way accordingly is entitled to summary judgment as to Counts One and Two to the extent predicated on Capalbo's second theory of recovery, the MDOL theory.

### E. Third Theory: Complaint About Excess Hours

Kris-Way seeks summary judgment as to Capalbo's third theory of recovery, the excessive hours theory, on the basis, *inter alia*, that the reports in question were made in conformity with Kris-Way's job requirements rather than constituting protected activity for purposes of either the MWPA or the STAA.  *See* Motion at 17-21; Reply at 4-5.

### 1.  MWPA

Kris-Way cites caselaw interpreting the federal Whistleblower Protection Act, other states' whistleblower protection acts, and the STAA for the proposition that "an employee is not engaged in a protected activity if the employee already has a duty to report the violations." Motion at 11; *see also, e.g., Willis v. Department of Agric.*, 141 F.3d 1139, 1144 (Fed. Cir. 1998) (construing federal Whistleblower Protection Act to afford no protection to reports that were required as part of employee's job duties, which did not place employee "at personal risk for the benefit of the public good"); *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229-30 (6th Cir. 1987) (construing STAA to afford no protection to reports made at "bitch sessions" during which employer invited employee and other drivers to air safety concerns); *Kidwell v. Sybaritic, Inc.*, 784 N.W.2d 220, 230 (Minn. 2010) (construing Minnesota Whistleblower Act to afford no protection to email report sent as part of employee's normal job duties as an in-house counsel).

Without confronting the force of Kris-Way's argument, Capalbo contends that, pursuant to the plain language of the MWPA, his evidence concerning his reports that he was approaching his maximum allowable hours suffices to create a triable issue of fact as to whether he engaged in protected activity.  *See* Opposition at 9-10.

I find no case considering whether the making of a required report constitutes a protected activity for purposes of the MWPA.  Nonetheless, the Law Court has stated that its "construction of the MHRA and [M]WPA has been guided by federal law[.]"  *Currie v. Industrial Sec., Inc.*, 2007 ME 12, ¶ 13, 915 A.2d 400, 404.  In addition, this court has noted that, for purposes of the MWPA, a protected activity "is broadly defined as conduct by the plaintiff that is in opposition to an unlawful employment practice of the defendant."  *Osher*, 703 F. Supp.2d at 66 (citations and internal punctuation omitted).

It is undisputed that Kris-Way told Capalbo in writing and orally that he shared responsibility for monitoring his hours and that he was to notify his supervisor whenever he was in danger of violating DOT regulations regarding the maximum hours of work.  *See* Defendant's SMF ¶ 17; Plaintiff's Opposing SMF ¶ 17.  Capalbo's evidence reveals that he did just that, variously notifying Farrin, Wheeler, Ryan, and his immediate supervisors at the bakery yard that he was about to exceed his maximum hours.  *See, e.g.*, Plaintiff's Additional SMF ¶¶ 6-10; Capalbo Dep. at 52-54, 113; Defendant's Reply SMF ¶ 10.  There is no evidence that, on those occasions that Capalbo was directed to continue working beyond his maximum hours, he complained to anyone about the illegality of that directive.  He never refused or failed to complete his yard jockey work at Country Kitchen, regardless of the hours that he was working.  *See* Defendant's SMF ¶ 36; Plaintiff's Opposing SMF ¶ 36.  Indeed, he states that he had to work excessive hours to support his family.  *See* Plaintiff's Additional SMF ¶ 9; Capalbo Dep. at 54.

No reasonable trier of fact could conclude that the reports described by Capalbo, which Kris-Way required of him, constituted conduct in opposition to an unlawful employment practice of Kris-Way.  Hence, they were not protected activity for purposes of the MWPA.  Kris-Way

accordingly demonstrates its entitlement to summary judgment as to Count One to the extent predicated on Capalbo's third theory of recovery, the excessive hours theory.

### 2. STAA

Capalbo does not dispute that his reports that he was about to exceed his maximum hours were not protected activity under the STAA. *See* Opposition at 14-17. In any event, for the reasons discussed above, they were not. Kris-Way accordingly demonstrates its entitlement to summary judgment as to Count Two to the extent predicated on Capalbo's third theory of recovery, the excessive hours theory.

### F. Fourth Theory: Complaint Concerning Logbooks

Capalbo contends that he marshals sufficient evidence to raise a triable issue that he was discharged in violation of both the MWPA and the STAA for refusing to carry out Farrin's illegal directive that he recreate six months' worth of logbooks. *See* Opposition at 9, 15-16. Kris-Way seeks summary judgment as to this fourth theory of recovery, the logbook theory, on grounds that (i) Capalbo's assertion that Farrin demanded that he recreate six months' worth of logs is inherently incredible, (ii) Capalbo fails to demonstrate that Kris-Way's reason for discharging him was pretextual, and (iii) his allegations of pretext fail, in any event, because Ryan, rather than Farrin, made the decision to discharge him. *See* Reply at 7-10.

### 1. Showing of Protected Activity

As a threshold matter, Kris-Way argues that no reasonable fact-finder could find that Capalbo refused Farrin's alleged request to recreate six months' worth of logs. *See* Reply at 7-8. It asserts that (i) Capalbo should have had copies of his logbooks for the first two weeks of August if, as he contends, he turned them in, (ii) Capalbo initially testified that he was asked to recreate only two weeks' worth of logs and then altered his testimony, but was unable to provide

any explanation for the change, (iii) it is incredible that Kris-Way would demand that Capalbo recreate six months' worth of logs when Capalbo allegedly had turned in three months' worth of logs, (iv) if Farrin wanted six months' worth of logs for the DOT audit, he would have provided Capalbo his timecards so that the DOT would not easily discover the fabrication, and (v) the fact that Capalbo did recreate two weeks' worth of logs, also an illegal act, undermines his claim that he refused to recreate six months' worth. *See id.*

Kris-Way makes a strong case; however, I do not find Capalbo's version of events so inherently incredible as to present no triable issue as to whether he engaged in protected activity. A reasonable fact-finder, crediting his version of events and drawing reasonable inferences therefrom, could conclude that (i) Kris-Way never required Capalbo to fill out logs for yard jockey work, *see* Plaintiff's Additional SMF ¶ 29; Capalbo Dep. at 80, (ii) Farrin had affirmatively directed yard jockeys not to keep logbooks, *see* Plaintiff's Additional SMF ¶ 20; Defendant's Reply SMF ¶ 20, (iii) Farrin knew that one of the purposes of the Auburn audit was to review the past six months' worth of Country Kitchen yard jockeys' logbooks for accuracy, *see* Defendant's SMF ¶ 42; Plaintiff's Opposing SMF ¶ 42; Plaintiff's Additional SMF ¶ 57; Defendant's Reply SMF ¶ 57, (iv) Farrin knew that Kris-Way did not have six months' worth of Capalbo's logbooks, *see* Defendant's SMF ¶ 44; Plaintiff's Opposing SMF ¶ 44, and (v) Farrin accordingly directed Capalbo to recreate six months' worth of logbooks and, when Capalbo protested the illegality of doing so, asked him to recreate only two weeks' worth, *see* Plaintiff's Additional SMF ¶¶ 41-42; Capalbo Dep. at 108-09; Capalbo Aff. ¶ 2.

### 2.  Showing of Pretext

Kris-Way next argues that its demand that Capalbo maintain logs cannot be viewed as the product of a retaliatory animus because Capalbo was in fact required to maintain logs, and his

arguments otherwise are predicated on a misreading of applicable law.  *See* Reply at 8-9.  In so arguing, however, Kris-Way oversimplifies Capalbo's pretext theory.  Even assuming *arguendo* that Capalbo (i) misunderstood applicable DOT regulations, (ii) should have turned in logbooks for every day worked in the six months prior to the DOT audit, and (iii) failed to do so, he offers sufficient evidence to generate a triable issue as to whether the proffered reason for his discharge – the falsification of logbooks – was a pretext for unlawful retaliation.[89]  A reasonable fact-finder crediting Capalbo's evidence and drawing all reasonable inferences in his favor could conclude that:

      1.    Kris-Way in general, and Farrin in particular, had been confused about DOT logbook requirements.  Kris-Way's description of the job of yard jockey does not contain a requirement that yard jockeys maintain logbooks.  *See* Plaintiff's Additional SMF ¶ 12; Defendant's Reply SMF ¶ 12.  Ryan, Kris-Way's Vice-President of Operations, did not believe, prior to January 2008, that yard jockeys were required to maintain logbooks.  *See id.* ¶ 11.  Farrin affirmatively instructed yard jockeys not to maintain logbooks for yard jockey work.  *See id.* ¶ 20.

      2.    While Farrin contends that Capalbo had problems maintaining logbooks, Capalbo's employment file is devoid of reference to any disciplinary action for such an offense.  *See id.* ¶¶ 47, 68.  Kris-Way had a "secret file" allegedly maintained by Farrin commencing in

---

[89] Capalbo acknowledges that, to the extent that he drove "over the road," he was required to keep that day's logbook plus the previous seven days' worth of logbooks available for inspection.  *See* Defendant's SMF ¶ 7; Capalbo Dep. at 94-95.  However, he argues that, as a yard jockey, he qualified for the so-called short-haul operations exemption from the daily logbook requirement.  *See* Opposition at 3; *see also* 49 C.F.R. §§ 395.1(e); 395.8.  Kris-Way disputes that he qualified for that exemption, pointing out that a driver must meet several criteria, *see* Reply at 9, one of which is that he or she "returns to the work reporting location and is released from work within 12 consecutive hours[,]" 49 C.F.R. § 395.1(e)(1)(ii).  Kris-Way notes that Capalbo maintains, and his records reveal, that he frequently worked shifts longer than 12 hours while employed as a yard jockey.  *See* Reply at 9.  Kris-Way appears to have the better argument.  However, for purposes of summary judgment, I need not definitively resolve this point.

January 2008 documenting warnings to Capalbo concerning his failure to maintain logbooks. *See id*. ¶ 16.  However, in January 2009, Kris-Way did nothing to ensure that other yard jockeys were filling out logs.  *See id*. ¶ 17.  In addition, Capalbo denies that the "secret file" warnings ever were given.  *See, e.g., id*. ¶ 18.  A reasonable fact-finder crediting Capalbo's evidence could conclude that (i) Kris-Way was not concerned, until the imminent DOT audit, about Capalbo's maintenance of logbooks or yard jockeys' maintenance of logbooks in general, and (ii) Farrin created the "secret log" to buttress Kris-Way's case for Capalbo's discharge, possibly, as Capalbo suggests, *see* Opposition at 7, subsequent to his discharge.

3.     Farrin knew that one of the purposes of the DOT audit was to review the prior six months of logbooks of Country Kitchen workers for accuracy.  *See* Defendant's SMF ¶ 42; Plaintiff's Opposing SMF ¶ 42; Plaintiff's Additional SMF ¶ 57; Defendant's Reply SMF ¶ 57. Farrin, who had affirmatively instructed yard jockeys not to maintain logbooks, had reason to be concerned that Kris-Way would be found in noncompliance with respect to yard jockeys' logbooks.  Tellingly, although Farrin stated in his affidavit that, at the time of Capalbo's discharge, he was in the process of making all of Kris-Way's records available to the DOT, he admits that he provided only those logbooks that were requested by the DOT.  *See* Plaintiff's Additional SMF ¶¶ 55-56; Defendant's Reply SMF ¶¶ 55-56.

4.     Capalbo had given Kris-Way his logbooks for the first two weeks of August, which Kris-Way apparently lost.  *See* Plaintiff's Additional SMF ¶¶ 50-51; Capalbo Dep. at 120; Errata Sheet.

5.     Farrin directed Capalbo, on August 18, 2008, to recreate initially six months' worth of logbooks, and then only those for the first two weeks of August.  *See* Plaintiff's Additional SMF ¶¶ 40-41; Capalbo Dep. at 108-09.

6.      After Capalbo balked and complained that recreating a logbook was illegal, *see* Plaintiff's Additional SMF ¶ 42; Capalbo Aff. ¶ 2, Farrin engineered his discharge by (i) refusing to provide him with copies of his timecards, which would have made his recreation of his logbooks more accurate, *see* Plaintiff's Additional SMF ¶¶ 43-44; Capalbo Dep. at 104-05, 119, (ii) complaining the following day to Ryan, who was Farrin's supervisor, about Capalbo's asserted logbook problems, *see* Defendant's SMF ¶ 47; First Farrin Aff. ¶¶ 27-28; Ryan Aff. ¶¶ 10-11, and (iii) participating in a meeting on August 20, 2008, during which Ryan compared Capalbo's recreated logbooks against his timecards, predictably finding discrepancies, *see* Defendant's SMF ¶¶ 50-54; Plaintiff's Opposing SMF ¶¶ 50-54.   Per Kris-Way's written policies, falsifying logbooks was an offense serious enough to warrant immediate termination. *See* Defendant's Reply SMF ¶ 68; Second Farrin Aff. ¶ 13 & Exh. 3 thereto.

7.      Although Capalbo's fellow yard jockey, Lord, turned in logbooks, they were not properly completed with respect to days in which Lord worked in the yard.   *See* Plaintiff's Additional SMF ¶ 78; Exh. 7 to Loranger Aff.   Yet, there is no evidence that Kris-Way took any disciplinary action against Lord.

A reasonable-fact finder crediting this evidence could infer that Farrin engineered Capalbo's discharge because Capalbo balked at recreating six months' worth of logbooks and complained that doing so was illegal.[90]

### 3.  Ryan as Decision-Maker

Kris-Way finally seeks summary judgment as to Capalbo's fourth theory of recovery, the logbook theory, on the basis that Capalbo ignores the fact that Ryan, rather than Farrin, made

---

[90] For purposes of Capalbo's first theory of recovery, the DOT theory, a reasonable fact-finder could also find that Farrin engineered Capalbo's discharge at least in part because he perceived that Capalbo had filed a complaint with the DOT and/or feared that Capalbo was about to cooperate with the pending DOT audit.

the decision to discharge him, rendering Farrin's alleged knowledge and motives irrelevant.  *See* Reply at 9-10 (quoting *Thompson*, 522 F.3d at 178 ("[T]he discriminatory intent of which a plaintiff complains must be traceable to the person or persons who made the decision to fire him.") (citation and internal quotation marks omitted)).

Nonetheless, a reasonable fact-finder could trace Ryan's decision to discharge Capalbo to Farrin's alleged retaliatory animus.  As this court has noted:

> [A]n employer may be held liable if the decisionmaker who discharged the plaintiff merely acted as a rubber stamp, or the "cat's paw," for a subordinate employee's prejudice, even if the decisionmaker lacked discriminatory intent.  It is appropriate to tag the employer with an employee's [retaliatory] animus if the evidence indicates that the worker possessed leverage, or exerted influence over, the titular decisionmaker.  To invoke the cat's paw analysis, a plaintiff must submit evidence sufficient to establish two conditions: (1) that the nondecisionmaker exhibited discriminatory animus; and, (2) the final decisionmaker acted as the conduit of the nondecisionmaker's prejudice.

*Donahue v. Clair Car Connection, Inc.*  736 F. Supp.2d 294, 320 (D. Me. 2010) (citations and internal punctuation omitted).  As discussed above, Capalbo adduces sufficient evidence to demonstrate discriminatory animus on Farrin's part and his active engineering, using Ryan as his "cat's paw," of Capalbo's discharge.

Kris-Way's request for summary judgment as to Counts One and Two, to the extent predicated on Capalbo's fourth theory of recovery, the logbook theory, accordingly is denied.

## IV.  Conclusion

For the foregoing reasons, I **GRANT** Kris-Way's motion for summary judgment as to Count One, to the extent predicated on Capalbo's first, second, and third theories of recovery, his DOT, MDOL, and excessive hours theories, and as to Count Two, to the extent predicated on his second and third theories of recovery, his MDOL and excessive hours theories, and otherwise **DENY** it.  Remaining for trial are Count One, to the extent predicated on Capalbo's fourth

theory of recovery, his logbook theory, and Count Two, to the extent predicated on his first and fourth theories of recovery, his DOT and logbook theories.

**_SO ORDERED_**.

Dated this 28th day of October, 2011.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge